UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X



| | |
|---|---|
| CONSTANTINE PAPPAS, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) Civil Action No. _____ |
| | ) |
| v. | ) CLASS ACTION |
| | ) |
| CHARM COMMUNICATIONS INC., HE DANG, ZHAN WANG, GANG CHEN, NICK WATERS, ENGADIN PARENT LIMITED, and ENGADIN MERGER LIMITED, | ) COMPLAINT BASED UPON ) SELF-DEALING AND FOR ) BREACH OF FIDUCIARY DUTY |
| | ) |
| Defendants. | ) |

14 CV 3926

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action on behalf of the holders of Charm Communications Inc. ("Charm" or the "Company") American Depository Shares ("ADS") against Charm, the members of Charm's Board of Directors (the "Board" or the "Individual Defendants"), Engadin Parent Limited ("Parent"), and Engadin Merger Limited ("Merger Sub") in connection with a definitive Agreement and Plan of Merger (the "Merger Agreement") entered into by Charm, Parent, and Merger Sub (the "Merger"). This action arises out of Defendants' pursuit of a going-private sale of the Cayman Islands-incorporated Company to a group led by the Company's Chairman and CEO, He Dang ("Dang") and certain of his affiliates, including Merry Circle

Trading Limited, Honour Idea Limited, and an investment fund affiliated with CMC Capital Partners HK Limited (the "Consortium," and with Parent and Merger Sub the "Buyout Group"). [1]

2.     On May 19, 2014, the Buyout Group and the Company announced that it had entered into the Merger Agreement pursuant to which the Buyout Group will acquire all of Charm's outstanding ADSs in an all-cash transaction for $4.70 per ADS. The Merger is expected to close before the third quarter of 2014. The Board has breached its fiduciary duties by agreeing to the Merger for inadequate consideration. As described in more detail below, given Charm's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.  Analysts set $5.00 price targets for the Company, which exceeded the $4.70 offer, and within the last year Charm's stock price closed more than $1.00 higher than the Merger consideration.

3.     Additionally, the Merger is the product of a hopelessly flawed sales process that was designed to ensure the sale of Charm to the Buyout Group on terms preferential to the Consortium at the expense of Plaintiff's and the Company's other public ADS holders. Defendant Dang, the Company's founder, CEO, and chairman of the Board, who, along with the Consortium own approximately 55.3% of the Company's outstanding shares. The Board and the special committee of directors appointed to negotiate the Merger (the "Special Committee") catered to the interests of Dang and the Buyout Group. Indeed, since receiving the Buyout Group's initial

---

[1] Although the Company is incorporated in the Cayman Islands, this Court has previously held that there is no actual conflict between the law of the Cayman Islands and New York law with respect to the breach of fiduciary duty claims. *Refco Inc. Sec. Litig. v. Aaron*, 826 F. Supp. 2d. 478, 500 (S.D.N.Y. 2010) (comparing the element of a fiduciary duty claim in the Cayman Islands to one in New York and finding that "[b]ecause there is no actual conflict of law, New York law governs the claims for breach of fiduciary duty again [a defendant] arising from this position on the Board. 'In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'") (quoting *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004)).

proposal on September 30, 2013, the Special Committee failed to negotiate even one more cent for the Company's ADS holders despite the Company's drastically improved business prospects.

4.  Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with unreasonable deal protection devices that serve to prevent other bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement the Defendants agreed to: (i) a limited 30 day go-shop period followed by a strict no-solicitation provision that prohibits the Company from soliciting other potential acquirers or from continuing ongoing discussions with potential acquirers; (ii) a provision that provides the Buyout Group with five Business Days (as that term is defined in the Merger Agreement) to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay the Buyout Group a $2.9 million termination fee to enter into a transaction with a superior bidder. These provisions unreasonably inhibit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Charm.

5.  The Individual Defendants have breached their fiduciary duties and the Buyout Group has aided and abetted such breaches by Charm's officers and directors. Plaintiff seeks to enjoin the Merger unless and/or until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of costs and interest. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      Additionally, this Court has jurisdiction over Charm because its ADSs trade on the NASDAQ Stock Exchange Global Market, headquartered within this district and the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of Charm ADSs. Plaintiff is a citizen of Connecticut.

9.      Charm is incorporated under the laws of the Cayman Islands. It maintains its principal executive offices at Legend Town, CN01 Floor 4, No. 1 Ba Li Zhuang Dong Li, Chaoyang District, Beijing 100025, People's Republic of China.

10.     Defendant Dang founded the Company in 1995 and has been its Chief Executive Officer and chairman of the Board since then. Dang is a citizen of the People's Republic of China.

11.     Defendant Zhan Wang ("Wang") has been a director of the Company since April 2010. Wang is a citizen of the People's Republic of China.

12.     Defendant Gang Chen ("Chen") has been a director of the Company since April 2011. Chen is a citizen of the People's Republic of China.

13.     Defendant Nick Waters ("Waters") has been a director of the Company since December 2011. Waters is not a citizen of the United States of America.

14.     Defendants referenced in ¶¶ 10 through 13 are collectively referred to as the Individual Defendants and/or the Board.

15.     Defendant Parent is an exempted company with limited liability incorporated under the laws of the Cayman Islands.

16.     Defendant Merger Sub is an exempted company with limited liability incorporated under the laws of the Cayman Islands and a direct wholly owned Subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action on behalf of himself and all other public holders of Charm ADSs that have been or will be harmed by Defendants' conduct as described herein (the "Class"). Excluded from the Class are Defendants and any individual or entity affiliated with any Defendant.

18.     This action is properly maintainable as a class action.

19.     The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of April 30, 2014 the Company had more than 19.1 million Class A ordinary shares and 65.2 million Class B ordinary shares issued and outstanding.

20.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include the following:

(a)     Whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, good faith, diligence, fair dealing, independence, and/or due care with respect to Plaintiff and the other members of the Class in connection with the Merger;

(b)     Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Merger;

(c)     Whether the Individual Defendants are conflicted or otherwise engaging in self-dealing in connection with the Merger;

(d)     Whether the Individual Defendants have breached any of their fiduciary duties owed to Plaintiff and the other members of the Class in connection with the Merger;

(e)     Whether the Individual Defendants are unjustly enriching themselves and/or the other insiders/affiliates of Charm in connection with the Merger;

(f)     Whether the Individual Defendants, in bad faith and for improper motives impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

(g)     Whether Charm aided and abetted any of the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Merger;

(h)     Whether Parent or Merger Sub aided or abetted any of the Individual Defendants' breaches of fiduciary duty owed to Plaintiff and the other members of the Class in connection with the Merger; and

(i)     Whether Plaintiff and other members of the Class would suffer irreparable injury were the Merger consummated without the actions complained of herein being corrected.

21.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

22.     Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

23.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.

24.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action. Indeed a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

26.     Under the law of the Cayman Islands, which is substantially similar to New York law concerning breach of fiduciary duty claims, the officers and directors of a publicly traded corporation have fiduciary duties of loyalty and care to shareholders. To comply with these duties, neither the officers nor directors may take any action that:

(a)     Adversely affects the value provided to the corporation's shareholders;

(b)     Will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c)     Contractually prohibits themselves from complying with their fiduciary duties;

(d)     Will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholder; and/or

(e)     Will provide the officers and/or directors with preferential treatment at the expense of, or separate from, the public ADS holders.

27.     In accordance with their duties of loyalty, the Individual Defendants, as officer and/or directors of Charm, are obligated to refrain from:

(a)    Participating in any transaction where the officers' or directors' loyalties are divided;

(b)    Participating in any transaction where the officers or directors receive, or are entitled to receive, a personal financial benefit not equally shared by the public ADS holders of the corporation; and/or

(c)    Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

28.    Defendants, separately and together, in connection with the Merger, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith, and independence owed to Plaintiff and the other public ADS holders of Charm. Certain of the Defendants stand on both sides of the transaction, are engaging in self-dealing, and are obtaining for themselves personal benefits, including personal financial benefits not shared equally by Plaintiff or the Class (as defined herein). Accordingly, the Merger will benefit the Individual Defendants in significant ways not shared by the Class members. As a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Charm ADS holdings in the Merger.

29.    Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Merger, the burden of proving inherent or entire fairness of the Merger, including all aspects of its negotiation, structure, price, and terms, is placed upon Defendants as a matter of law.

## SUBSTANTIVE ALLEGATIONS

30.    Charm is a leading advertising agency group in China that offers integrated advertising services with a particular focus on television and internet ads. Charm's integrated

advertising services include full media planning and buying, as well as creative and branding services. Charm has built a full service digital advertising platform, which offers digital campaign capabilities across all key digital media, including search engines, display portals, online video sites and social networking services. Charm also secures advertising inventory and other advertising rights, such as sponsorships and branded content, from premium media networks and resells to clients as part of its integrated media offerings. Charm's clients include China's top domestic brands, as well as major international brands across a wide range of industries. Since 2003 Charm has been the top agency every year for China's leading television network, China Central Television.

31.     On May 10, 2010, the Company completed its initial public offering, which sold approximately 7.8 million ADSs and raised more than $69 million. On May 10, 2010, the day the Company completed its initial public offering, Charm's stock closed at $9.21. Roughly four years later, at a time when the Company's stock is poised for significant growth, the Buyout Group is attempting to capitalize on Charm's artificially deflated stock price for their own benefit at the expense of the Company's ADS holders.

32.     The Company rebounded from a slow start in 2013 with a strong second quarter. On September 26, 2013 the Company filed a Form 6-K/A with the U.S. Securities and Exchange Commission ("SEC"), which contained Charm's second quarter financial results. Charm announced that revenues grew 19.1% compared to the second quarter of 2012 and gross profit increased 35.6% compared to the same quarter of the prior year. The Company also improved its long-term business prospects by winning key pieces of new business, including Kia Motors. Defendant Dang stated that the newly acquired Kia Motors account was the Company's "largest ever" and "will start contributing to our [the Company's] revenues in the second half of this year."

Dang also remarked that the Kia Motors account "reflects the growth and development of our agency to date, specifically our ability to offer integrated advertising solutions and dedicated customer service to global clients." In addition to Kia Motors, the advertising agency won other major accounts in the second quarter of 2013 for campaigns scheduled to commence in the second half of 2013, including the full, integrated media business for Dangdan, Haier, as well as business with Skyworth, Bright Diary, China CITIC Bank, and Jianlibao Group.

33.     On September 30, 2013, the Company announced that it received a going private proposal from the Buyout Group to purchase all ADSs for $4.70 per share. Several weeks later, on October 4, 2013, Charm filed a Form 6-K with the SEC announcing the establishment of the Special Committee. Wang, Chen, and then-director Andrew J. Rickards ("Rickards") were members of the Special Committee, with Wang serving as chairperson.

34.     The Company's SEC filings indicate that the Special Committee did not have authority to solicit offers from other potential purchasers. The Company's October 4, 2013 Form 6-K stated that the Special Committee "intends to retain advisors, including an independent financial advisor, to assist in the evaluation of the [going-private] Proposal and any additional proposals that may be made by Mr. Dang and his affiliates." The same Form 6-K also stated that the Special Committee had the responsibility to "evaluate, negotiate and recommend to the board of directors any proposals involving a strategic transaction by the Company with one or more third parties." Crucially, the filings did not include language authorizing the Special Committee to actively solicit parties and engage in a robust sales process.

35.     Three days later, the Company filed a Form 6-K with the SEC announcing that the Company's chief financial officer, Mr. Wei Zhou, would be leaving the Company, effective November 1, 2013.

36.     On October 31, 2013, Charm filed a Form 6-K with the SEC announcing that the Special Committee retained financial and legal advisors. This SEC filing also indicated that the Special Committee was not given the authority to actively shop the Company or solicit interest from other potential purchasers. The Form 6-K stated, in relevant part, that the advisors would "assist the Special Committee in reviewing and evaluating the preliminary non-binding proposal received by the Company's board of directors on September 30, 2013" from Defendant Dang and the Buyout Group, as well as assisting the "Special Committee in reviewing and evaluating any additional proposal that may be made by the [Buyout Group] or other parties, if any." Again, these filings indicate that the Special Committee was not authorized to conduct a robust and competitive sales process designed to obtain the highest price for Charm ADS holders.

37.     On December 2, 2013 Charm filed a Form 6-K that contained the Company's financial results for the quarter ended September 30, 2013. The Company suffered a temporary drop in its financial results, which Defendant Dang partially attributed to temporary challenges, such as a "sudden drop in television ratings for some of the media inventories we had previously underwritten[.]" Nonetheless, Dang touted the Company's future business prospects and stated that Charm made "solid progress in building our [the Company's] integrated capabilities through key client wins and by increasing the scale of our multimedia trading platform." Indeed, the Form 6-K stated that the Company won new business in the third quarter from China Merchants Bank, a full media campaign for Wuliangye Wine, and a print media campaign for ICBC.

38.     On April 3, 2014, Charm filed a Form 6-K announcing that Rickards—a member of the Board and the Special Committee—did not intend to renew his independent director agreement with the Company when it ended on April 9, 2014.

39.     After the Company's disappointing third quarter, Charm quickly rebounded and announced tremendous fourth quarter and full year financial results, for the period ended December 31, 2013. In the fourth quarter, the Company reported a 31.9% increase in revenues when compared to the same period of the prior year and a 55% increase in gross profits when compared to the fourth quarter of 2013. Charm's full year results were equally impressive. The Company's 2013 revenues were 11% higher compared to 2012 and its gross profit increased 20.4% compared to the prior year.

40.     Defendant Deng expressed optimism about the Company performance in 2013 and its future business prospects. Deng stated that in the fourth quarter of 2013 the Company "continued to reposition [its] overall business in the wake of significant changes in the industry and the continued growth of online media, although television-related advertising remains a significant part of our business." Looking ahead to fiscal 2014, Deng stated that the Company's "underlying business showed improvement at the end of last year, and we have already started to restructure and eliminate a number of loss-making projects and non-performing teams," which Deng expected would "lead to better results this year despite television advertising spending experiencing an historically slow rate of growth in the first quarter of 2014[.]"

41.     Despite the Company's strong future business prospects, the Merger will prevent Charm ADS holders from sharing in the benefits of the Company's restructuring efforts or the business boom that will likely accompany television advertising's rebound from "historically slow" growth rates.

*The Merger Fails to Maximize Shareholder Value*

42.    In a press release dated May 19, 2014, the Company announced that it had entered into a merger agreement with the Buyout Group pursuant to which the Buyout Group will acquire all of the ADSs of the Company for $4.70 per share.

43.    Given the Company's recent strong performance and its positioning for growth, the Merger consideration is inadequate and significantly undervalues the Company.

44.    Charm stock has recently traded in excess of the Merger offer price of $4.70. In fact, approximately one year ago on May 21, 2013, Charm's stock closed at $5.85: more than $1.00 higher than the current offer.

45.    Further, according to Yahoo Finance, at least one Wall Street analyst had a price target of $5.00 per share.

46.    Moreover, studies show that mergers where the purchasers are insiders of the target company provide substantially less consideration to the target company's shareholders. An August 28, 2008 article in the *New Yorker* highlights the inherent conflict that arises upon the sale of a publicly traded company to insiders. As it noted:

> Since the beginning of 2005, nearly a hundred top-level executives at public companies have participated in management buyouts, or M.B.O.s, joining private- equity investors to buy their companies from shareholders.

> \*        \*        \*

> The executives behind these buyouts say that they're the best solution for everyone involved. Investors get a nice bump in the price of their shares-H.C.A. shareholders, for instance, are getting twenty percent more than the market price- and executive are free from the demands of cautious investors and zealous regulators.

> \*        \*        \*

> ***What the executives in these deals don't say is that such buyouts create huge conflicts of interest.*** The C.E.O. of a public company

13

is legally obligated to look after shareholders' interests, which in the case of selling the company means getting the highest price possible. But when that same C.E.O. is trying to buy the company, he wants to pay the lowest price possible. Companies try to get around this by having independent members of the board of directors negotiate the deal. In practice, however, directors have generally been appointed by the company's C.E.O. and have spent a good deal of time working with him; they're hardly likely to drive a hard bargain. When the consortium led by Aramark's C.E.O. first bid for the company, for instance, it offered thirty-two dollars a share. After shareholders complained, it upped the bid by $1.80, which directors accepted. Now, that's some real haggling. *A study of buyouts over the past two years suggests that when management is the buyer it pays, on average, thirty percent less than an outside bidder.*

Even more troubling, management buyouts give executives at public companies an incentive not to maximize the value of their companies before the sale. In 1987, for instance, after the textile giant Burlington Industries was taken private by a buyout group that included top Burlington executives, it quickly sold off the company's "nonproductive assets," including ten separate divisions and a host of manufacturing plants, for well over half a billion dollars. The executives could have done those deals while Burlington was a public company. But doing them after the buyout, when they owned more of the firm, meant that they reaped more of the benefits. Similarly, management buyouts are often associated with major restructurings to make companies leaner and more profitable. With few exceptions, these restructurings could be done before buyouts. But they're not, in part because executives would rather wait until they own a bigger chunk of the company. A study of buyouts in the U.K., for instance, found that C.E.O.s who planned to buy their own companies were less likely to embark on restructuring than C.E.O.s who weren't.

*Also, executives, before making a buyout offer, use accounting gimmicks to make their company's performance look worse than it really is.* In a study of more than sixty companies that went private, Sharon Katz, of the Harvard Business School, found that, in the two years preceding a management buyout, companies recorded lower than expected accounts receivable, which drove profits down. Similarly, a study by tow accounting professors found that executives pursuing M.B.O.s tended to accelerate the recognition of revenue, making their companies' performance. But these studies suggest that part of the reason is that executives were making them look bad while they were public.

\*       \*       \*

But if management buyouts were really about the virtues of private ownership you'd expect companies that go private to stay private. The reality, though, is that, with high-profile deals, this rarely happens. Instead, after a company has been buffed and shines, it's generally taken public again. Both H.C.A. and Aramark, in fact, have gone from public to private to public, and now are private again. This suggests that management buyouts are often simply an opportunity for insiders to pick up assets on the cheap and flip them a few years later for fantastic sums. Over the past fifteen years, public companies have come up with ever more lavish performance-related pay packages, in the hopes of giving C.E.O.'s enough incentive to do their jobs and look after shareholders' interests. But why expect someone to be happy with tens of millions of dollars for putting shareholders first when he can get hundreds of millions for putting them last?

(emphasis added).

47.    Further, as *The Wall Street Journal* reported on September 8, 2006, the process through which a company is sold to insiders is generally skewed in favor of the company's management. The Wall Street Journal article highlights this conflict as follows:

In such cases [where a company is being sold to management], management, with all its detailed knowledge of the company, goes from being a seller striving for a high price to being a buyer looking for an attractive price. Usually the sale of a public company involves an auction or a competitive-bidding process. But when management [is involved], there often isn't such an open procedure, and the process is especially fraught with potential conflicts of interest.

\*         \*         \*

While some boards are diligent in vetting deals, the process sometimes is skewed in favor of a sale. For example, there usually is a period when other bidders can come forth with offers. But if that window is short, the likelihood of a rival bid emerging isn't large, since potential buyers won't have time to perform due diligence. Special committees charged with weighing deals also can set breakup fees that make rival bidders pay dearly to get rid of the original buyer.

(emphasis added).

15

48.     The Buyout Group is seeking to acquire the Company at the most opportune time, at a time when the Company is performing very well and is positioned for tremendous growth.

*The Unreasonable Deal Protection Devices*

49.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and unreasonable deal protection devices that operate conjunctively to make the Merger a *fait accompli* and potentially precludes competing offers from emerging for the Company.

50.     Following a brief 30-day go-shop period, § 7.2(a)-(b) of the Merger Agreement includes a strict no solicitation provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by the Buyout Group. Section 7.2(b) requires that the Company terminate any and all prior or ongoing discussions with other potential acquirers following the limited go-shop period.

51.     Pursuant to § 7.2(d) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify the Buyout Group of the bidder's identity and the terms of the bidder's offer. Thereafter, § 7.2(d) demands that should the Board determine to enter into a superior competing proposal, it must grant the Buyout Group five Business Days (as that term is defined in the Merger Agreement) in which the Company must negotiate in good faith with the Buyout Group (if the Buyout Group so desires) and allow the Buyout Group to amend the terms of the Merger Agreement to make a counter-offer so that the competing proposal "ceases to constitute a Superior Proposal." In other words, the Merger Agreement gives the Buyout Group access to any rival bidder's information and allows the Buyout Group a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor the Buyout Group and piggy-back upon the due diligence of the foreclosed second bidder.

52.     The Merger Agreement also provides that the Company must pay the Buyout Group a $2.9 million termination fee if Charm decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

53.     Moreover, Defendant Dang and his controlled entities, which collectively own approximately 55.3% of the Company's outstanding shares, have entered into a rollover and support agreement with Parent and Merger Sub and have agreed, among other things, to vote all of their ordinary shares (including those represented by ADSs) in favor of the Merger. Accordingly, approximately 55.3% of Charm's ordinary stock is already "locked up" in favor of the Merger. Additionally, since the Merger is contingent on the approval of an affirmative vote of shareholders representing two-thirds of the Company's ordinary shares, the Merger needs to be approved by approximately 24% of minority shareholders—less than a majority of the minority. The "lock-up" and two-thirds voting provisions essentially results in the disenfranchisement of the Company's shareholders and ADS holders because their votes will have little bearing on the outcome.

54.     Ultimately, these deal protection provisions unreasonably restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

55.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

56.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

57.     The Individual Defendants' recommendation of the Merger will result in a change of control of the Company, which imposes heightened fiduciary responsibilities to maximize Charm's value for the benefit of ADS holders and requires enhanced scrutiny by the Court.

58.     By acts, transactions, and courses of conduct alleged herein, the Individual Defendants are attempting to deprive Plaintiff and other members of the Class of the true value of their investment in Charm, or have otherwise failed to secure the best price reasonable under the circumstances for Plaintiff and other members of the Class.

59.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have breached their fiduciary duty of due care owed to Charm's public ADS holders.

60.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not received and will not receive their fair portion of the value of Charm's assets and will be prevented from benefiting from a value-maximizing transaction.

61.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Merger, to the irreparable harm of the Class.

### COUNT II
### Aiding and Abetting
### (Against Charm and the Buyout Group)

62.     Plaintiff repeats and realleges each allegation set forth herein.

63.    As alleged in more detail above, Defendants Charm and the Buyout Group have aided and abetted the Individual Defendants' breaches of fiduciary duties.

64.    As a result, Plaintiff and the Class members are being harmed.

65.    Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)    declaring that the Individual Defendants have breached their fiduciary duties;

(C)    declaring that the Merger Agreement and Merger were entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

(D)    Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Merger or performing the same until such time, as any, that the Individual Defendants have adequately undertaken all appropriate and available methods to maximize shareholder value;

(E)    In the event that the Merger is consummated prior to the entry of this Court's final judgment, rescinding the Merger Agreement and Merger, and/or awarding actual and punitive damages, with pre- and post-judgment interest to Plaintiff and the other members of the Class;

(F)     Directing that Defendants account to Plaintiff and the other members of the

Class for all damaged caused by them and account for all profits and any special benefits obtained

as a result of their breaches of their fiduciary duties;

(G)     Awarding Plaintiff the costs of this action, including a reasonable allowance

for the fees and expenses of Plaintiff's attorneys and experts; and

(H)     Granting Plaintiff and the other members of the Class such further relief as

the Court deems just and proper.

Dated: June 2, 2014                          Respectfully submitted,

                                             LEVI & KORSINSKY, LLP
                                             Shane T. Rowley, Esq.
                                             30 Broad Street, 24th Floor
                                             New York, New York 10004
                                             Tel: (212) 363-7500
                                             Fax: (866) 367-6510

                                             *Attorneys for Plaintiff*